Estate of Walburga Hedrick, Deceased (a.k.a. Walburga Oesterreich), Ray Bert Hedrick, Executor v. Commissioner.
Estate of Hedrick v. Commissioner
Docket No. 1848-63.
United States Tax Court
T.C. Memo 1964-228; 1964 Tax Ct. Memo LEXIS 110; 23 T.C.M. (CCH) 1374; T.C.M. (RIA) 64228; August 27, 1964
*110 Charles I. Rosin, 408 S. Spring St., Los Angeles, Calif., for the petitioner. Douglas W. Argue, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following deficiencies in petitioner's income taxes: Year
Deficiency [1]
1947
$ 276.99
1948
1,593.35
1949
1,561.34
1950
1,648.59
1952
1,941.80
1953
1,755.04
1954
1,637.41
1955
2,149.67
1956
2,285.31
1957
2,182.16
1958
1,759.24
1959
2,268.52
1960
2,106.37
The issues for decision are: (1) Is the respondent collaterally estopped from litigating in this proceeding the issue of whether the petitioner realized interest income as a result of a long-term sale arrangement? (2) Did the petitioner receive interest income during the years in issue? Findings of Fact Some of the facts have been stipulated by the parties and are so found, including the findings of fact set forth in the Court's opinion in the cases of Walburga Oesterreich and Wilshire Holding Corporation, Docket Nos. 32946 and 32954, reported as . Petitioner is *111 the Estate of Walburga Hedrick, deceased, (also known and hereinafter sometimes referred to as Walburga Oesterreich). Ray Bert Hedrick is the executor of the Estate of Walburga Hedrick, deceased. The decedent filed her Federal income tax returns for each of the years here in issue with the district director of internal revenue at Los Angeles, California. Walburga Oesterreich acquired three adjoining lots, 552, 553 and 554, in January 1926. One of the lots was on the corner of Wilshire Boulevard and Hamilton Drive in Beverly Hills, California. Wilshire Amusement Corporation was incorporated in 1929 by Albert M. and Albert J. Chotiner, father and son, for the purpose of building a motion picture theater. They directed a real estate broker, operating in Beverly Hills, to find a suitable location which they could lease and on which they could construct a theater. The broker learned from Walburga Oesterreich that she would be willing to enter into a lease for the three vacant lots she owned. The broker arranged a meeting between the Chotiners and Walburga and, after negotiations, Walburga and Wilshire Amusement Corporation entered into an agreement entitled "lease" dated September 11, 1929. The *112 Chotiners decided in the course of the negotiations that additional land would be needed for the theater which they desired to build and for that reason Wilshire Amusement Corporation purchased lot 555 and the northerly 40 feet of lot 556 at a total cost to it of $19,650. Wilshire conveyed that land to Walburga in the fall of 1929. The agreement of September 11, 1929, which was recorded in the official records of Los Angeles County, provided, in part, as follows: (a) Walburga is referred to as lessor and Wilshire Amusement Corporation is referred to as lessee throughout the agreement. It provides for payments called "rent" to be paid by the lessee to the lessor. It covers lots 552, 553, 554, 555 and the north 40 feet of lot 556 and provides that the lessor lets those properties to the lessee for a term of 67 years and eight months beginning September 1, 1929 and ending on the last day of April 1997. (b) The lessee agreed to pay the lessor total rent of $679,380 payable in monthly installments in accordance with a rental schedule. The rental schedule provided for an annual rental of $7,500 for the first 10 years, $12,000 for the succeeding 18 years and amounts becoming progressively *113 smaller at the rate of $113.40 each year so that the rental for the 68th year was $7,500. (c) The lessee agreed to pay all taxes and similar charges on the property. The lessee agreed to erect a new building on the premises to cost not less than $300,000 and to be completed not later than July 1, 1930. The lessee agreed to take out adequate fire insurance on the building and insurance to protect the lessee from claims arising out of the use of the premises. (d) The lessor agreed to join in the execution of notes or debentures and in a deed of trust or mortgage covering the leased premises to secure a loan not to exceed $225,000 to be used in constructing the building. (e) The agreement states that the lessee proposes to sublease a portion of the building for theater purposes. The lease could be assigned by the lessee upon the terms stated therein and such an assignment would release the lessee of further obligations under the lease. The lessor could declare the lease terminated in case of a default continuing longer than a period stated in the lease. The lessee had the right, but was not bound, to tear down any building which might be built on the premises for the purpose of *114 reconstruction in accordance with the terms of the lease should the original building become obsolete or not suited to the purposes of the lessee. Any such replacement building was to cost not less than $325,000. (f) One paragraph of the agreement provided that: The Lessor hereby promises and agrees that, upon the expiration of the term of this lease by lapse of time, and when all of the terms and conditions of this lease have been met and all of the rentals and other payments provided to be paid shall have been paid at the times and in the manner provided, the Lessor promises and agrees that she will then, upon the payment to her of the further sum of ten dollars ($10.00) in hand, convey or cause to be conveyed by grant deed to the Lessee free and clear of all encumbrance, all of the real property herein leased, without further or other consideration. Wilshire Amusement Corporation changed its name to Wilshire-Hamilton Properties, Inc., shortly after September 11, 1929. Wilshire Holding Corporation succeeded to the interest of Wilshire-Hamilton under the agreement of September 11, 1929, in August 1935. For each of the years 1947 through 1957, the agreement of September 11, 1929, provided *115 for annual payments of $12,000, payable $1,000 each month. For the years 1958, 1959 and 1960, the agreement called for declining annual payments in the sums of $11,922.60, $11,809.20, and $11,688.80, respectively. On her Federal income tax return for the year 1947, Walburga returned that year's $12,000 annual payment under Schedule B of the return entitled "Income from Rent Royalties." For all years subsequent to 1947 she returned the annual payments as long-term capital gain under Schedule D of the return entitled "Gains and Losses on Sales or Exchanges of Property." Lots 552, 553 and 554 were worth between $50,000 and $75,000 in 1929. On October 29, 1955, the Court of Appeals for the Ninth Circuit decided the case of , which involved the tax treatment to be accorded the 1946 "rental" payments received by Walburga under the agreement of September 11, 1929. A consistent decision was rendered by the Court of Appeals upon consideration of the other side of the transaction in the companion case, tried at the same time as the Oesterreich case, of *116 (C.A. 9, 1956), in which the Ninth Circuit held, on the authority of its earlier decision in Oesterreich, that the payments Wilshire made in 1945 and 1946 were not rental disbursements. However, such decision did not resolve the question as to whether Wilshire was entitled to deduct these payments for tax purposes. The income tax consequence of the transaction to Wilshire was finally resolved as a result of two subsequent appeals to the Ninth Circuit. These two later opinions are (C.A. 9, 1958), reversing a Memorandum Opinion of this Court, and (C.A. 9, 1960), reversing a Memorandum Opinion of this Court, rehearing denied (C.A. 9, 1961). In the notice of deficiency dated February 15, 1963, respondent increased decedent's taxable income for each of the years at issue by an item of "interest income" with the following explanation: (a) and (b): It is determined that Walburga Oesterreich realized ordinary income, because such portion of payments received [from Wilshire Holding Co.] was equivalent to interest income, *117 in the amount of , * * *. The amount that was determined to be "equivalent to interest income" was derived from attachments "A," "B" and "C" of the notice of deficiency which further explained the "interest income" adjustment. The amounts allocated to interest in "Exhibit C" to the notice of deficiency were taken from an amortization schedule respondent prepared for the purpose of allocating the monthly payments provided for in the agreement of September 11, 1929, between principal and interest over the life of the agreement. Respondent made three basic assumptions in preparing his amortization table: First, that the principal amount to be amortized was $75,000; second, that a 12 percent interest rate was to apply to unpaid principals; and, third, that the principal amount was to be amortized over the 67 year, 8 month term of the agreement of September 11, 1929. For greater accuracy respondent applied the 12 percent interest rate to a computed average of each year's opening and closing principal balances. This method of computation fell short of amortizing the principal amount of $75,000 by the sum of $812.83. In order to amortize the entire amount of $75,000 over the life of *118 the agreement, the respondent adjusted his amortization table by reducing annual interest payments and increasing annual principal payments by prorated portion of the unamortized principal sum of $812.83. This downward adjustment of interest in each year created an effective interest rate of approximately 11.9 percent over the life of the agreement. Under the respondent's amortization schedule the $7,500 payments provided for in each of the first ten years of the agreement were not sufficient to pay off the interest respondent computed to be due on the average of opening and closing principal balances for those years. Consequently, respondent added the total unpaid interest his computations indicated was due for those years to the outstanding principal balance so that, in effect, the accumulation of unpaid interest over the first ten years of the agreement bore the same annual interest rate as unpaid principal. For the years in issue the respondent's amortization computations reflected the following breakdown between principal and interest: Year
Payment
Principal
Interest
1947
$12,000.00
$ 305.64
$11,694.36
1948
12,000.00
342.59
11,657.41
1949
12,000.00
284.26
11,615.74
1950
12,000.00
431.25
11,568.75
1952
12,000.00
543.98
11,456.02
1953
12,000.00
611.36
11,388.64
1954
12,000.00
687.35
11,312.65
1955
12,000.00
773.03
11,226.97
1956
12,000.00
869.65
11,130.35
1957
12,000.00
978.60
11,021.40
1958
11,922.60
1,019.13
10,903.47
1959
11,809.20
1,026.54
10,782.66
1960
11,695.80
1,034.93
10,660.87
*119 The amounts of "Interest" shown above were received by petitioner under the sale arrangement with Wilshire Holding Corporation and are taxable as ordinary income during the years in issue. Opinion Relying on the doctrine of collateral estoppel, the petitioner takes the position that the decision of the Court of Appeals in , prevents respondent from allocating any portion of the amounts payable under the Oesterreich-Wilshire agreement of September 11, 1929, to the payment and receipt of interest. This is challenged by respondent, who contends that collateral estoppel does not apply where, as here, an intervening decision in 1961 by the Ninth Circuit in the related case of , brought about a significant change or development in the law governing the Oesterreich-Wilshire agreement and arrangements similar thereto. In addition, respondent contends that the doctrine of collateral estoppel cannot be used to bar this proceeding because the substantive issue here is not identical to the substantive issue litigated in the Oesterreich case. We agree with the respondent. *120 Under the doctrine of collateral estoppel a prior decision on the merits operates as a conclusive bar to subsequent litigation of a different tax year involving the same parties, issue, and facts as the prior proceedings, at least where there has been no change or development in the law. . Unlike res judicata the less restrictive collateral estoppel concept only bars litigation of those questions that were actually litigated in the prior proceeding as distinguished from those questions that could have been litigated. . The breadth of collateral estoppel is described by the Supreme Court in Sunnen as follows: It [collateral estoppel] must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. The requirements as to parties and facts are not at issue here. The real party here in interest is unquestionably the same as in the prior Oesterreich case. Neither are the basic facts in the record different *121 from those presented to the Ninth Circuit in the prior Oesterreich case. At the trial the parties orally stipulated that the agreement and transaction involved in this proceeding is the same agreement and transaction as was involved in the prior Oesterreich and Wilshire cases. The only new evidence submitted in this proceeding deals with the allocation of the monthly payments between interest and principal. And this evidence becomes relevant only in deciding the substantive issue of the respondent's adjustments to decedent's income. What is in dispute is whether or not the issue in this proceeding is the same as the issue considered in the prior Oesterreich case. The broad question involved in the Oesterreich case was whether the rental payments decedent received in 1946 constituted gain from the sale of a capital asset. In the context of that case this question was dependent upon whether or not the lease agreement of September 11, 1929 represented a lease or a contract for the sale of land. The Court of Appeals held that there was a sale of land and that the decedent was entitled to treat the sales price as capital gain. Unfortunately, the Oesterreich decision was allowed to become *122 final before the related issue in the companion Wilshire case was finally resolved on appeal to the Ninth Circuit. In the Wilshire case the Court of Appeals, subsequent to its decision in the Oesterreich case, held that decedent's arrangement with Wilshire gave rise to the payment and receipt of interest for Federal income tax purposes. The effect of this holding was to create a new issue on the payee's (the decedent's) side of the transaction. The latitude allowed in subsequent litigation is explained by the Supreme Court in Sunnen as follows: Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. The point urged by respondent here, which was not at issue in the first proceeding, is whether an element of interest existed in the arrangements between decedent and Wilshire. Admittedly, this point might have been tendered and decided at the time the Oesterreich case was decided. However, it was not. As indicated in the above quotation from Sunnen, the fact that *123 it was not so litigated is not fatal as long as the new point was not at issue and resolved in the prior case. The respondent argues, and we agree, that the issue of whether interest was inherent in the transaction with Wilshire is fundamentally different than the substantive issue considered in Oesterreich. The existence of a new issue for the payee (the decedent) was recognized in the second Wilshire opinion () wherein the Ninth Circuit suggested that consistent results for both taxpayers would be desirable. For procedural reasons, however, it was impossible to achieve this consistency for the tax year involved in the prior Oesterreich case. The instant case represents an attempt by respondent to achieve this consistency for subsequent years by reallocating the payments made by Wilshire between interest and principal pursuant to the Ninth Circuit's opinions in the companion Wilshire case. Petitioner would like to retain the pre-Wilshire viewpoint of the transaction so that no interest income will be attributed to the decedent for subsequent years. Petitioner thus contends that since the decedent was permitted to treat the payments received in 1946 as capital *124 gains no different tax treatment may be accorded these payments in subsequent years. In other words, petitioner would have us apply collateral estoppel to preclude any inquiry into whether or not the transaction involved the payment and receipt of interest. As previously stated, the substantive holding of the prior Oesterreich case was that the agreement of September 11, 1929, constituted a sale. Respondent has adopted this holding as a major premise in the determination of the deficiencies here involved. However, respondent does take issue with the petitioner's position that this holding precludes respondent from ever again questioning the nature of the payments made under the agreement of September 11, 1929. As the Supreme Court said in Sunnen, "a change or development in the controlling legal principles may make that [a prior] determination obsolete or erroneous, at least for future purposes." Such a change or development has occurred with respect to the Oesterreich-Wilshire transaction. We think the second and third Wilshire opinions created a change in legal climate so that the precedent value of the Oesterreich decision was nullified for collateral estoppel purposes. The *125 supervening change or development in the law that respondent relies upon in this case is not only found in the second and third Wilshire opinions but also in (C.A. 9, 1958), involving the tax treatment of "rentals" to a "lessor" recast as a seller, and (C.A. 9, 1959), involving the tax treatment of "rentals" to a "lessee" recast as a purchaser. In effect, these cases hold that long-term sale agreements similar to the agreement of September 11, 1929, inherently contain an element of interest. Thus, the effect of the subsequent Wilshire opinions was to modify the Oesterreich decision to the significant extent that not all of the payments received by the decedent represented payments on a sales price. Cf. (C.A. 7, 1956), affirming . Since we are of the opinion that the prior Oesterreich decision is not conclusive in this proceeding, it therefore becomes necessary for us to consider the substantive question of whether petitioner realized interest income, and how much, during the years here involved. This, of *126 course, concerns the adjustments made by respondent to petitioner's income based on the second () and third () Wilshire opinions. Respondent determined that decedent realized additional income because some portion of payments received from Wilshire Holding Corporation was equivalent to interest income rather than gain from the sale or exchange of a capital asset. The method used in computing the deficiencies is set out in our findings of fact. The determination was founded upon two premises: First, that the so-called lease arrangement between the decedent and Wilshire Holding Corporation was for tax purposes an installment sale; second, that a portion of the annual payments the decedent received represented interest on deferred payments over the 67 year, 8 month period called for in the agreement of September 11, 1929. In the second Wilshire opinion the Court of Appeals considered whether or not the so-called monthly "rental" payment could properly be apportioned between principal and interest. As the Ninth Circuit viewed its prior Oesterreich and Wilshire decisions, this apportionment question was still open for consideration by *127 the trial court. Accordingly, the Ninth Circuit reversed this Court with instructions to consider whether or not for tax deduction purposes Wilshire should be permitted to allocate its monthly disbursements between principal and interest, i.e., between a nondeductible and a deductible expenditure. In its opinion the Court of Appeals also observed that if the Tax Court found that apportionment was proper it assumed that an appropriate formula and legal interest rate could be found to reflect such an apportionment. On the remand we adopted Wilshire's computation of the amounts to be allocated between principal and interest for the years there at issue and entered a decision in accordance with such computation. This decision was subsequently reviewed in the third Wilshire opinion, which indicates that the Court of Appeals for the Ninth Circuit thought that decedent's arrangement with Wilshire gave rise to the payment and receipt of interest for Federal income tax purposes. The question remained, however, of precisely how the interest element inherent in each of the monthly payments specified in the agreement of September 11, 1929, should be computed. This problem was dealt with by the *128 Court of Appeals and it suggested that one way to compute the interest factor would be to apply a going interest rate in an amortization schedule with each payment being first applied to interest and then to principal. After rejecting the interest computation adopted by this Court on the second remand of the Wilshire case, the Court of Appeals reversed with directions that an amortization table be established utilizing a 12 percent interest rate on unpaid balances. The deficiencies determined for each of the thirteen years involved in this proceeding are the product of an amortization table prepared by respondent for the purpose of allocating all payments under the agreement of September 11, 1929, between principal and interest. As a starting point, respondent made two assumptions in establishing the amortization table designated as respondent's Exhibit Q in this record - the interest rate and the principal amount to be amortized. A 12 percent interest rate and a $75,000 principal balance were used. The interest rate is sanctioned by the third Wilshire opinion wherein the Ninth Circuit directed us to apply this rate to unpaid balances. The respondent's other assumption, the use of *129 a $75,000 principal amount to be amortized, is supported by the only evidence of record dealing with the market value of the property transferred as of the "sale" date in 1929. This evidence shows that the three lots decedent "sold" were worth between $50,000 and $75,000 in 1929. Thus, in his computations, respondent used the highest of the range of values disclosed by the evidence, i.e., $75,000. This amount, as the principal amount to be amortized over the life of the agreement, constituted the unpaid balance to which the 12 percent interest rate was applied. As a final step after obtaining the interest figure for each year, respondent first applied the annual payment to discharging interest with any amount remaining assigned to the repayment of the principal, or the price. Respondent submits, and we agree, that these basic calculations are consistent with the approach of the Ninth Circuit to this problem, as evidenced by the following observation that - Had the Tax Court found a going rate, used it in an amortization, with each payment being applied first to interest, then to principal (the calculation is complicated, but it can be done, and a principal amount evolved), we would *130 have been inclined to uphold it. We think the money which cannot be allowed as interest must be assigned to principal or the price. Respondent went further than merely establishing a standard amortization table. To simplify the computations respondent computed interest on an annual instead of a monthly basis. To insure a high degree of accuracy in using this short cut, respondent applied the interest rate of 12 percent per annum to a computed average of each year's opening and closing unpaid principal balances. The resultant figure represented each year's interest element of the total annual payment. Because respondent's computations failed to amortize $812.83 of the $75,000 starting principal balance, he adjusted his computations by increasing the amount allocated to principal in each year of the term of the agreement by a pro rata share of the unamortized principal sum of $812.83. This adjustment to the amortization table caused the 12 percent interest rate utilized in the computations to be reduced to an effective interest rate of approximately 11.9 percent over the life of the agreement. The respondent also decided that unpaid interest should be added to the outstanding principal *131 balance. Consequently, during the first ten years of the rental term when computed interest was greater than each year's annual payment, unpaid interest for each year was added to the principal and, thereafter, bore the same interest rate as unpaid principal. The effect of increasing the principal balance by unpaid interest was that by 1941 the average principal balance had increased to $98,958.31, its highest point. This unpaid principal balance was annually reduced so that by 1997 the end of the 67 year, 8 month term of the lease, it was at zero reflecting that the entire $75,000 principal or sales price had been amortized. Although petitioner contends that the purpose of respondent's computations was to accomplish a predetermined tax result and that respondent "juggled figures of his own invention" and used a "usurious rate of interest," there is nothing in the record to support these contentions. And none of the cases cited by petitioner are helpful. We conclude that the method respondent used in determining interest income was consistent with the principles set forth in the Wilshire opinions, was reasonable, was based upon information available at the time the computations *132 were made, and is supported by facts established in this record. Accordingly, we hold that petitioner has failed to prove error in respondent's determination. Decision will be entered under Rule 50. Footnotes
1. Respondent has asserted no deficiency for the year 1951.↩